UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAKEEM YOUNG,                    )
                                 )
            Petitioner,          )    CIVIL ACTION NO.
                                 )    10-10820-DPW
v.                               )
                                 )
TOM DICKHAUT,                    )
                                 )
            Respondent.          )

MEMORANDUM AND ORDER
August 22, 2012

    After unsuccessfully appealing in Massachusetts state courts
his convictions for murder in the second degree, armed assault
with intent to murder, and unlawful possession of a firearm,
Petitioner Rakeem Young now seeks a federal writ of *habeas
corpus*.  He argues entitlement to federal relief on two grounds:
(1) that the exclusion of Young's brother from the courtroom
during the testimony of a witness violated Young's Sixth
Amendment right to a public trial and (2) that the admission of
statements that Young made to Darrell Williams, an individual who
Young argues was acting as an agent of the government, violated
Young's rights under *Massiah v. United States*, 377 U.S. 201
(1964).  For the reasons set forth more fully below, I will deny
habeas relief.

## I. BACKGROUND

### *A. Facts Regarding the Offense*

Factual determinations made by state courts are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This presumption applies to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Coombs v. State of Me.*, 202 F.3d 14, 18 (1st Cir. 2000) (quoting *Bryson v. Ward*, 187 F.3d 1193, 1211 (10th Cir. 1999) (internal quotation marks omitted)). It applies regardless of whether the factual findings were made by the state trial or appellate court. *Teti v. Bender*, 507 F.3d 50, 58-59 (1st Cir. 2007). The following facts regarding the charges in the instant case are drawn from the summary of evidence recounted by the Massachusetts Appeals Court, as the last state court to provide a reasoned decision in the case[1]:

> During the evening of June 19, 2004, the [petitioner] was assaulted near Orchard Park in the Roxbury section of Boston. He was taken by ambulance to Boston Medical Center, where he was treated for severe facial injuries and discharged later that evening. That same evening, Darrell Williams, with his friend, Cassim Weaver (the victim), picked up three female acquaintances, Sherry and Nicole McCullough and Bonnie Greene, in Williams's car. Williams

---

[1]  A federal court engaging in habeas review "looks through" an unexplained state court order to the "last reasoned decision" in the state court case. *See Gunter v. Maloney*, 291 F.3d 74, 80 (1st Cir. 2002).

was driving, Weaver was in the front passenger seat, and the
three young women were in the back seat. They stopped at the
Peking House, a Chinese restaurant near Orchard Park, and
then drove to a parking lot nearby. While they were there,
the [petitioner]'s brother, Chancellor Young, drove into the
lot and parked his car in front of Williams's car. The
[petitioner] emerged from the back seat, walked over to the
driver's side window of Williams's car and asked, "Which one
of you all jumped me?" Shortly thereafter, the [petitioner]
fired several shots into the car, fatally injuring Weaver,
and injuring Williams. The [petitioner] fled in the vehicle
driven by his brother. Approximately six months later, on
February 1, 2005, Williams shot and killed another brother
of the defendant, Terrence Young.

*Commonwealth v. Young*, 899 N.E.2d 838, 841 (Mass. App. Ct. 2009).

## B. *Procedural History and Facts Relevant to Petition*

On September 30, 2004, Young was indicted by a Suffolk
County grand jury for the murder of Cassim Weaver, armed assault
with intent to murder Darrell Williams, and the unlawful
possession of a firearm.  The events relevant to this petition
all occurred after Young was indicted.

Almost two years after the indictment and shortly before
trial, Young made the statements at issue in his *Massiah*
argument.  The MAC recited the following facts with regard to the
circumstances of those statements:

[Darrell] Williams, on May 9, 2006, signed an agreement
stating that the Commonwealth would allow Williams to plead
guilty to murder in the second degree in exchange for
Williams's "complete and truthful" testimony in the
[petitioner]'s case.

*Id.* at 842.

The agreement [between the Commonwealth and Williams]
contain[ed] the following language:

> "Mr. Williams agrees to provide complete and truthful information to law enforcement officials investigating and prosecuting the murder of Cassim Weaver and the related non-fatal shooting of Mr. Williams. Mr. Williams agrees to make himself available for and to testify completely and truthfully at any hearings or trials relating to the murder of Cassim Weaver and the non-fatal shooting of Mr. Williams.... This agreement is contingent upon the truthfulness of the information and testimony that Mr. Williams has provided and will continue to provide to law enforcement officials regarding the June 20, 2004 homicide of Cassim Weaver and the non-fatal shooting of Mr. Williams."

*Id.* at 842 n.2.

> On May 19, 2006, Williams was brought to court to plead guilty to murder in the second degree in regard to the killing of Terrence. Williams, however, changed his mind and refused to plead guilty because he believed that he did not receive a good enough deal.

> On June 21, 2006, the day before the [petitioner]'s trial was to begin, the prosecutor had Williams brought to court in order to learn whether Williams was to be a witness in the defendant's trial. The same day, the [petitioner] was also to be brought to court. Williams and the [petitioner] were placed in the same temporary holding cell awaiting transportation to the court house. While there, the [petitioner] told Williams that (1) if Williams did not testify against him, he would make sure that a witness in Williams's case would not testify against Williams; (2) he knew the mother of Williams's child and the mother of Williams's brother's child; and (3) he followed Williams on the night of the incident and knew he was at the Peking House. The [petitioner] also told Williams that he (the [petitioner]) had been beaten earlier in the evening and that the persons who beat him "hung" with Williams. After the conversation, Williams was brought into the court room, where he refused to testify against the [petitioner] invoking his privilege under the Fifth Amendment to the United States Constitution.

*Id.* at 842.

The jury trial commenced on June 22, 2006.  On the second day of trial, Zabin, the prosecutor, announced that Williams had changed his mind and intended to testify against Young.

On the third day of trial, Zabin alerted the judge at a sidebar conference to difficulties he was having with witness Bonnie Greene.  Zabin and the judge engaged in the following exchange:

> MR. ZABIN: The witness is down there in the waiting area.  Apparently she saw some of the people in the courtroom.  She's refusing to come out of the room.  She's down there where they're trying to talk to her.  She's afraid.
>
> THE COURT: Right.  Here's the problem; is this.  It's obviously a public courtroom and I understand, my rulings notwithstanding, I'm well aware of the nature of these circumstances surrounding these alleged events . . . .  I have no problem if there's a surgical request made, but she's not a child.  I certainly cannot literally clear the courtroom for the reasons that I don't think there's a basis for it.  It really would look--I don't want the defendant being--you know, being blamed for some kind of nefarious comings and goings.  If you can articulate any particular concerns that I can address in a particular fashion, I'll be happy to entertain that, but I can't-
>
> MR. ZABIN: . . . .  [H]er specific concern, I think, is with the defendant's brother.  Now, I can say to the Court based on our investigation, she doesn't identify the defendant's brother as being there.  It doesn't mean that she didn't see him.  He is, you know--I'm not quite sure how to deal with him.  He is a percipient witness in the fact that, quite frankly, he was identified by Darrell Williams as driving the getaway car and he's sitting in the courtroom.  And I think she's aware of that.  Now, she's never said to them that she knows who is he.  But, suddenly, with the understanding that he's in the courtroom, and how she knows that--maybe she saw him outside.
> . . . .
>
> THE COURT: . . . [The defendant's brother has] been sitting here calmly, so I--you know, if you can articulate a concern she has.  I mean it doesn't have to be detailed, but if there's some specific concern she has with, vis-á-vis,

the brother, then I'd be happy to entertain a request with
regard to the brother. But, I think I need something in
fairness to him, because it's a public courtroom and whether
it's where people are seated or what have you . . . .

After a recess, the judge held another sidebar conference,

during which she and Zabin engaged in the following conversation:

MR. ZABIN: I've been down there the entire time. At
this point she's refusing to pick her head up and come in.
She's crying. She's terrified. I talked to her and I'm
trying to get some idea specifically what her concerns are.
And she says she'll tell you and she'll tell the jury, but
she doesn't want anyone else in here. I said obviously
that's not going to happen. She doesn't want to testify in
front of the defendant, again, which is something that's not
going to happen. She talked about the people in the
courtroom, and again, didn't specifically name Chancellor
Young. I think, quite frankly, given that that's an issue--
that that is one issue. But I can't say that removing him
alone is going to get her in this room . . . .
THE COURT: Okay, well, I mean, I guess--so you're basically
nowhere in terms of this particular witness. It seems to me
it would be better for her to get it over with. Like I
said, I would not be adverse--I'd hear from the defendant
before I made any decision, but I would not be adverse to
some kind of surgical, you know, effort made. But, to be
blunt if she's concerned then it seems to me that it would
be--I mean, the defendant has to be here, so removing the
brother doesn't really accomplish anything anyway it seems
to me . . . .
MR. ZABIN: . . . . I mean, I think quite frankly, she
wants to do it without the defendant sitting here. That was
her concern, but we told her that is just not going to
happen. I think the brother is a concern and, frankly, I
think for this one witness--I understand he's not on the
witness list anymore. Mr. Bourbeau's removed him. I think
it's in order to allow him to sit in the courtroom. If
Darrell Williams testifies, he is a percipient witness and
somebody who we have very strong reason to believe was
involved in this. In fact, I can represent to the Court he
wasn't charged because he was the defendant's brother and
there was no legal basis to charge accessory after the
fact . . . . Now it doesn't relate to this witness in
particular, but I'm not sure she doesn't--I don't know what
she knows, what she knows on the street and whether or not
she, in fact, knows who Chancellor Young is and just isn't

6

telling me. But, somehow she's learned that he's in the courtroom and she has indicated in the past that she doesn't want to testify and she was concerned, but nothing like this. I would say just that her, sort of, family members raising the fact that the brother was in here set her off.

THE COURT: . . . [P]ractically speaking, even if I have the brother removed from the courtroom--just assuming that I do that based on what you've said--you know he's--I guess someone needs to explain to her he's going to be out in the hallway and if you ask me to go one further and say I don't want him in the hallway, I want him outside, I mean, she'll still--obviously, maybe she's young. I'm not questioning--it's not for me to say whether her fears are valid or not. I--but, practically speaking, I don't know if someone needs to kind of--I mean--it doesn't really achieve or accomplish much if she's afraid that he's going to be kind of like staring at her. Does her concern like, have--in her line of vision have just family members over there probably can be seated in the other part of the courtroom.

MR. ZABIN: To be frank, her concern was not him staring her down or intimidating her in the courtroom. She's worried about having him see her face in the courtroom and what's going to happen afterwards.

THE COURT: Well, he doesn't know what she looks like? . . . .

MR. ZABIN: You know, the facts of the case is, I mean, if she's in the backseat it's entirely possible that Chancellor Young was driving the car, that he wouldn't have even known that she was in the backseat of the car. They may not know each other.

THE COURT: Well, I guess I'm not sure what you're asking. You seem to be suggesting if it's just a question--I mean, they're serious charges and she's an important witness and so I will take reasonable steps that don't impact the public's interest in general. So removing one person from the gallery to ensure that a material witness is able to testify in a way that does not affect the defendant, I don't have a huge problem with . . . . Again, it's clear from your opening and what I know of the case, that she's a hugely important witness, particularly if Mr. Williams isn't testifying, and I understand that. And I'd do the same thing for the defendant if there was a crucial witness, make reasonable accommodations. And so I'm prepared to do it, but I'm not prepared,--and again I'm not trying to be harsh on her, but I'm not prepared to negotiate with a witness the terms in which she can come into the courtroom. So my only concern in saying what I've said is that I don't want some kind of counteroffer. I don't want, you know--I mean, it

seems to me that if she's told that here's how we'll address her concerns, if she has concerns, is that she can have her family members seated in that part of the gallery that's within her sight of vision. She can come and go from an elevator that's not public. You know, we can do those things, but beyond that I don't know.

The judge later asked Bourbeau, the defense attorney, for his position on the issue. Bourbeau stated:

I think the Court obviously knows both the competition or confrontation rights, as well as the public's right to be here. I just wanted to say one brief point in response to that. From what I understand, this witness doesn't even know the Young family whatsoever; at least that was the Grand Jury testimony . . . . I don't see in way, shape or form that Rakeem's brother could in any way affect this case. And, you know, the allegations that are made, he was acquitted of those allegations. I mean quite frankly he's got every right to be here.

Later that day, the witness entered the room, and the judge heard her at sidebar in the presence of attorneys for both sides. They engaged in the following discussion, in relevant part:

THE COURT: Okay, and is there any particular--all witnesses get nervous, especially in a serious case. That's understandable. All witnesses get nervous, but is there anything in particular that you're concerned about that you want to talk to me about? Or you're just generally nervous?
MS. GREENE: Nervous.
THE COURT: Excuse me?
MS. GREENE: I'm nervous.
THE COURT: So is there anything in particular that you're concerned about?
MS. GREENE: I know some of his family.
. . . .
THE COURT: When you say "*his*", the defendant's family>
MS. GREENE: . . . Yeah.
THE COURT: And that would include any of his siblings, his brothers?
MS. GREENE: [Moving head up and down.]
THE COURT: And is there anything about that that has you concerned?
MS. GREENE: The whole thing, period.

8

THE COURT: The whole thing, period?  Just being a
witness to the alleged events?
        MS. GREENE: [Moving head up and down.]

        The judge then told Greene that if it would help, Greene

could enter through a door other than the main door and could

come upstairs using a private elevator.  The judge offered that

"if there are members of the defendant's family that you're

concerned about, we'll clear those people from the courtroom, as

well."  The judge additionally stated that she could keep the

seats in the line of vision of the witness stand open for

Greene's family or friends.  The judge told the witness that she

would leave it to the prosecutor to work out the logistics, but

that the witness was required to come to Court, even if she was

nervous.

        The next day, the judge excluded Chancellor Young from the

courtroom during Greene's testimony.  She made no explicit

findings and presented no explicit justification for the

exclusion.  Defense counsel objected to the decision.

        Williams also testified on the fourth day of trial.  Defense

counsel, informed that the prosecutor intended to elicit

testimony from Williams regarding the statements that Young made

on June 21, 2006, in the temporary holding cell, filed a motion

challenging the admission of those statements.  The attorneys and

the judge engaged in the following exchange:

        MR. BOURBEAU: . . . . I would suggest to the Court that
        it's really a strong concern that I have, whether this type

of misconduct is intentional, and thus a Massiah
violation . . . .

     THE COURT: . . . I would want to ask the Commonwealth,
it seems to me, unless there's some evidence or some showing
that [placing the two men together] was intentionally done
by agents of the government, if it was just, you know, not
the brightest management decision ever made by the
Department of Corrections or the Sheriff's office, that I
don't know that the Commonwealth should be precluded . . . .

     MR. ZABIN: . . . . They were supposed to have been, and
they have been separated for two years. How that happened--
certainly, I don't think that Mr. Bourbeau's suggesting that
we orchestrated that. I can't think of anything that would
be more detrimental to the interests of the Commonwealth in
trying to get a witness to testify, than to put them
together . . . . There was no--and I can assure the Court
that they were transported here together was a surprise to
me, and something that from the Commonwealth's
perspective . . . and I'm sure from Mr. Williams'
perspective, was something that should not have happened.
They were separated while they were in custody at the Nashua
Street Jail, for obvious reasons. And why that happened, I
don't know. I had no information, and Mr. Williams came in
here, as the Court is aware, and took the Fifth. I didn't
ask, or Sergeant Daley didn't ask him if that was the reason
he took the Fifth. But, certainly putting those two people
together, the likely result of that would have been for
exactly what happened on Thursday; would be a witness that
was essential to the Commonwealth's case, refusing to
testify. He was not placed there. I have no information
that anyone from the jail did that. I don't know that
anyone from the jail would do such a thing. You know,
certainly they would have, I think, some severe liabilities
or problems if there was a physical altercation between the
two, which would have been something that, I think, could
have been quite likely.

After hearing from both the prosecutor and defense counsel, the

judge stated:

    Well, I think because the law doesn't prohibit if something
falls into their lap, because the defendant and a witness,
or the defendant chooses to talk to a potential witness. I
don't know that the case law supports that the
Commonwealth's precluded. And so my understanding of the
law on this score, both State and Federal, that you've cited
the Massiah case, is that if it's being done for the purpose

of eliciting incriminating statements, that would trigger
potential Massiah concerns.  But, I've not been presented
with anything to think this was other than an accident, and,
you know, happenstance that perhaps those statements are
beneficial to the Commonwealth.  So, I'm going to deny the
motion in limine.

The judge allowed Williams to testify regarding his conversation
with Young in the holding cell.

At the conclusion of the trial, the jury found Young guilty
of murder in the second degree, armed assault with intent to
murder, and unlawful possession of a firearm.  After sentencing,
Young filed a notice of appeal, and the case was entered in the
Massachusetts Appeals Court on September 21, 2007.  Among the
issues appealed were the two grounds presented in the petition
now before me.

On January 8, 2009, the Appeals Court affirmed the
conviction below.  *See Young*, 899 N.E.2d at 846.  The Appeals
Court held that the petitioner's "brother's exclusion from the
courtroom during Greene's testimony was not an abuse of the
judge's discretion" because (1) "Greene was hesitant to testify"
and afraid; (2) "the prosecution identified the defendant's
brother as a 'specific concern' for her"; and (3) after the judge
inquired if there was anything about which Greene was
particularly concerned, Greene replied, "I know some of his
family" and then acknowledged that this included his brothers.
*Id*. at 845.  The Appeals Court held that the government did not
violate the petitioner's *Massiah* rights because (1) Williams was

not an agent of the Commonwealth at the time the petitioner made the statements at issue, which was apparent because Williams had repudiated the agreement when he refused to plead guilty and because he had refused to testify against the petitioner; (2) "there was no evidence that the Commonwealth intentionally had Williams placed in the holding cell with the [petitioner]"; and (3) the statements of the [petitioner] indicate that they were not the product of any questioning or interrogation by Williams" but instead were "volunteered" statements which "do not implicate the Sixth Amendment." *Id.* at 843.

Young filed an Application for Leave to Obtain Further Appellate Review in the Massachusetts Supreme Judicial Court, which was denied on February 25, 2009. *See Commonwealth v. Young*, 902 N.E.2d 947 (Table) (Mass. 2009). Young thereafter filed this application for a writ of *habeas corpus*.

## II.  STANDARD OF REVIEW

A federal court may consider an application for a writ of *habeas corpus* on behalf of an individual in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241 *et seq.*, habeas relief may be granted if the adjudication on the merits in state court "resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The Supreme Court has narrowly interpreted "clearly established federal law" to refer "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court's decision is "contrary to" such law if its conclusion is "opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 413.  A state court's decision "involve[s] an unreasonable application" of such law if the court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.

Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 411).  Instead, "that application must be objectively

unreasonable.  This distinction creates a substantially higher threshold for obtaining relief than *de novo* review."  *Id*. (internal citations omitted).

### III.  ANALYSIS

#### A.  *Right to a Public Trial*

Young contends that the trial court violated his Sixth Amendment right to an open trial when the judge partially closed the courtroom by excluding Chancellor Young during the testimony of Bonnie Greene.  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."  *In re Oliver*, 333 U.S. 257, 270 n.25 (1948). "Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."  *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501, 508 (1984).

The Supreme Court has held that "the right to an open trial may give way in certain cases to other rights and interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).  "The presumption of openness may be overcome only by an overriding interest based on

findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *Press-Enterprise Co.*, 464 U.S. at 510). In *Waller*, the Supreme Court held that trial closure is appropriate when: (1) the party seeking closure "advance[s] an overriding interest that is likely to be prejudiced," (2) "the closure [is] no broader than necessary to protect that interest," (3) "the trial court consider[s] reasonable alternatives to closing the proceeding," and (4) the trial court "make[s] findings adequate to support that closure." *Id.* at 48.

Young contends that the state court's ruling was contrary to, and involved an unreasonable application of, *Waller*. However, *Waller* concerned the complete closure of a courtroom and not the exclusion of individual spectators. *Id.* at 42. Because there is no clearly established federal law with respect to partial closures,[2] I cannot find that the state court's ruling warrants habeas relief under AEDPA. *See Angiano v. Scribner*, 366

---

[2] The parties (correctly) do not rely on *Presley v. Georgia*, 130 S. Ct. 721 (2010) (per curiam), the most recent Supreme Court case to discuss a defendant's Sixth Amendment right to an open trial. *Presley* was decided after Young's trial and consequently cannot constitute clearly established law for the purposes of Young's request for habeas relief. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (defining "clearly established law" as the Supreme Court's holdings "as of the time of the relevant state-court decision."). In addition, *Presley* addressed a total, and not partial, closure of a courtroom. *See Presley*, 130 S. Ct. at 722. *Presley* therefore does not govern the issue that faced the trial court with respect to Chancellor Young's exclusion during Bonnie Greene's testimony.

Fed. App'x 726, 726 (9th Cir. 2010) ("The Circuits are split as
to the applicability of the four-part test in *Waller* to 'partial
closures,' where only one person is excluded from a trial.  On
federal habeas review, relief is not available based on
conflicting interpretations of circuit precedent.  Accordingly,
we cannot conclude that the state court's exclusion of
Petitioner's wife was 'contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States.'" (internal citation
omitted)); *Garcia v. Bertsch*, 470 F.3d 748, 752-54 (8th Cir.
2006) ("The Supreme Court has not spoken on the partial closure
issue, and the Court's closest case, *Waller*, is distinguishable
on its facts.  Our belief that the issue may have been decided
differently in our court or in another circuit court is not
grounds for granting habeas relief."); *Wells v. Hartley*, No. CV
07-1406 CAS (FMO), 2011 WL 7111822, at *12 (C.D. Cal. Dec. 19,
2011) ("[T]he Supreme Court has never addressed the situation
that occurred here, i.e., a partial closure of portions of
petitioner's preliminary hearing.  Accordingly, the California
Court of Appeal's rejection of [the Sixth Amendment claim] cannot
be contrary to, or an unreasonable application of, clearly
established federal law." (internal citations omitted)); *Alarcia
v. Remington*, No. SA CV 10-447-PSG (SH), 2010 WL 3766337, at *8
(C.D. Cal. Sept. 10, 2010) ("Since there is no controlling United

States Supreme Court case for partial closures, the Court is unable to find that the California courts' rejection of petitioner's claim was contrary to or involved an unreasonable application of clearly established law, as determined by the United States Supreme Court.").

Citing *Guzman v. Scully*, 80 F.3d 772 (2d Cir. 1996), Young first argues that "[t]he public trial guarantee has been considered so important that courts have reversed convictions or granted habeas relief where the courtroom was closed only to certain individuals during the testimony of just one witness." In *Guzman*, the Second Circuit granted habeas relief after four spectators were excluded during the testimony of a prosecution witness in circumstances that did not meet the modified *Waller* test that the Second Circuit applied to partial closures. *See Guzman*, 80 F.3d at 774-777. The case was decided on April 8, 1996, weeks before the passage of AEDPA. *See* AEDPA, Pub. L. No. 104-132 (April 24, 1996). Before AEDPA, the Second Circuit evaluated questions of law presented in habeas petitions using *de novo* review. *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) ("Prior to AEDPA, pure questions of law and mixed questions of law and fact were reviewed *de novo*."). After AEDPA, this standard of review was no longer appropriate; *Guzman* is therefore inapposite.

Young next contends that the state court's decision was an
unreasonable application of firmly established Supreme Court law
because the Appeals Court unreasonably refused to extend the
*Waller* rule to partial courtroom closures.  While a majority of
the Supreme Court has not yet adopted an "unreasonably refused to
extend" application of AEDPA, *see Williams v. Taylor*, 529 U.S.
362, 408-09 (2000) ("Today's case does not require us to decide
how such 'extension of legal principle cases' should be treated
under § 2254(d)(1)."),[3] the First Circuit has held that "a state
court's decision runs afoul of the 'unreasonable application'
prong if the court . . . unreasonably refuses to extend [a legal
principle from the Supreme Court's precedent] to a new context
where it should apply."  *Dagley v. Russo*, 540 F.3d 8, 13 (1st
Cir. 2008) (internal quotation marks omitted).  I do not find,
however, that the refusal to extend *Waller* was unreasonable here.

Young cites *Kennaugh v. Miller*, 289 F.3d 36 (2d Cir. 2002),
for the proposition that a court should evaluate whether it is
unreasonable to refuse to extend a legal principle derived from
Supreme Court precedent to a new context by inquiring (1) whether
application of the rule in the situation before it was reasonably

---

[3]  A plurality of the Court has adopted this interpretation.
*See Ramdass v. Angelone*, 530 U.S. 156, 166 (plurality opinion)
("A state determination may be set aside under this standard if,
under clearly established federal law, the state court was
unreasonable in refusing to extend the governing legal principle
to a context in which the principle should have controlled.").

necessary to avoid the constitutional harm the rule was designed
to prevent and (2) whether extending the rule was supported by
the decisions of federal Courts of Appeal.  These inquiries
convince me that it was not unreasonable of the Appeals Court to
refuse to extend *Waller* in Young's case.

It was not unreasonable to hold that something other than
the *Waller* test could suffice, in the context of a partial
closure, to avoid the constitutional harm that the *Waller* test
was designed to prevent.  The *Waller* Court observed "that the
presence of interested spectators may keep [the defendant's]
triers keenly alive to a sense of their responsibility and to the
importance of their functions" and "encourages witnesses to come
forward and discourages perjury."  *Waller*, 467 U.S. at 46.  These
concerns are substantially lessened where only one among many
spectators is excluded.[4]  *See Garcia*, 470 F.3d at 753 (quoting
*United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994)
(quoting *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992)))

---

[4]  While I acknowledge Young's contention that his brother,
an alleged witness of the crimes, might have been particularly
well situated to discourage perjury on the part of Bonnie Greene,
I am not convinced that this renders unreasonable a refusal to
apply the *Waller* test.  When considering the specifics of this
case, it is unclear whether Chancellor Young's presence would
have *discouraged* perjury because of his knowledge of the events
or would have *encouraged* perjury because of Greene's fear of him.
On a more general level, although Chancellor Young's exclusion
raises some of the concerns addressed in *Waller*, it--and other
partial closures--does not raise them to the same degree as a
complete closure of the courtroom would have.

("[A] partial closure does not implicate the same secrecy and fairness concerns that a partial closure does").

The case law of the various federal Courts of Appeals confirms the reasonableness of refusing to extend *Waller*. The Second, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits have all modified the *Waller* test in the context of partial closures. *See United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995); *United States v. Farmer*, 32 F.3d 369, 371-72 (8th Cir. 1994); *Woods v. Kuhlmann*, 977 F.2d 74, 76-77 (2d. Cir. 1992); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989), *cert. denied*, 506 U.S. 958 (1992); *Nieto v. Sullivan*, 879 F.2d 743, 752-53 (10th Cir. 1989), *cert. denied*, 493 U.S. 957 (1989); *Douglas v. Wainwright*, 739 F.2d 531, 532-33 (11th Cir. 1984), *cert. denied*, 469 U.S. 1208 (1985).

Third, Young notes that the First Circuit has stated that *Waller* provides a "distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations," *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998), and contends that *Waller* should consequently be applied here. While it is no doubt the case that the multi-factor test in *Waller* was designed for application to variant factual situations, it was not unreasonable to limit the variant factual situations to which *Waller* applies to those involving complete closures of the courtroom. Indeed, although

the First Circuit has not yet expressly adopted the modified *Waller* test applied by other circuits, it has differentiated between "the 'total' closure in *Waller*, which excluded *all* persons (other than court personnel, witnesses, parties and trial counsel) throughout the entire suppression hearing" and a "'partial' closure" that barred or chilled the attendance of only some spectators. *See United States v. DeLuca*, 137 F.3d 24, 33 (1st Cir. 1998) (emphasis in original) (internal citation omitted).

Finally, Young contends that the trial court's evaluation of his Sixth Amendment claim was inadequate under either the *Waller* test or the modified *Waller* test applied by the Second, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits to partial closures. Young confuses the issue. The *Waller* test is not clearly established law in this context because *Waller* did not address partial closures. The modified *Waller* test applied by certain circuits to partial closures is not clearly established law because it constitutes the holdings of various circuits and not of the Supreme Court. Young has not demonstrated that Chancellor Young's temporary exclusion from the courtroom violated his Sixth Amendment rights in a manner sufficient to ground a claim for habeas relief under AEDPA.

**B.    Massiah Rights**

Young also contends that the government violated his Sixth Amendment right to the assistance of counsel as described in *Massiah v. United States*, 377 U.S. 201 (1964), and its progeny. In *Massiah*, the Supreme Court held that a defendant is "denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. *Massiah* applied this rule not only to direct questioning by the police or a prosecutor, but also to "indirect and surreptitious interrogations" in which a government informant elicits incriminating statements. *Id.*

In *United States v. Henry*, the Supreme Court applied this holding to a situation that Young claims mirrors the circumstances of his own case. In *Henry*, the Supreme Court emphasized that "three factors [were] important": (1) an inmate was acting as a paid informant for the government; (2) the informant was ostensibly no more than a fellow inmate of the defendant, who did not know that the fellow inmate was an informant; and (3) the defendant was in custody and under indictment when the informant engaged him in conversation. *Henry*, 447 U.S. 264, 270 (1980). The Supreme Court held that

22

"[b]y intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel, the Government violated [the defendant]'s Sixth Amendment right to counsel." *Id.* at 274-75.

Young contends that by introducing Williams's testimony regarding the June 21, 2006, conversation between Young and Williams in the holding cell, the government violated his Sixth Amendment right to counsel. The Appeals Court provided three reasons that *Massiah* and its progeny do not apply. Young argues that each was an unreasonable determination of the facts or application of the law.

### 1. Agency

The first reason presented by the Appeals Court to support the view that the government did not violate Young's Sixth Amendment right to counsel was that Williams was not acting as an agent for the government at the time of the June 21, 2006, conversation. The Appeals Court stated:

> We begin by considering whether the agreement between Williams and the Commonwealth was in effect at the time the defendant made his statements to Williams. The undisputed facts demonstrate that after Williams entered into the agreement with the Commonwealth on May 9, 2006, he repudiated the agreement on May 19, 2006, when he refused to plead guilty to second degree murder, the "benefit" he had been promised if he provided "complete and truthful information to law enforcement officials investigating and prosecuting the murder of Cassim Weaver" (see note 2, *supra*).
> On June 21, 2006, the date the defendant made the contested statements to Williams in the holding cell, Williams refused to testify against the defendant. Not until

23

> five days later did Williams change his mind and notify the
> prosecutor that he would testify. Therefore, Williams was
> not an agent of the Commonwealth at the time the defendant
> made the statements.

*Young*, 899 N.E.2d at 843.  Young contends that (1) this

determination of the facts was unreasonable and (2) the state

court unreasonably applied *Henry*.

First, Young argues that the state court's determination of

the facts was unreasonable because Williams testified that his

conversation with Young occurred while he "was agreeing to

testify for the Commonwealth . . . ."[5]  Williams's testimony,

however, essentially related not to a factual but instead to a

legal determination, and legal determinations are the province of

the courts.  Moreover, in this context those legal determinations

were governed by Massachusetts law.  *See Ricketts v. Adamson*, 483

U.S. 1, 5 n.3 (1987) ("[T]he construction of the plea agreement

---

[5]  Williams testified as follows on cross-examination:
Q.  And while you were [at the Peking House] is when you say
Rakeem Young came up and was following you?
A.  Well, that's what he told me.
Q.  All right.  And you're sure of that?
A.  That's what he told me.
Q.  That he was following you at 2 o'clock in the morning at
the Peking House?
A.  Around that time, yeah.
Q.  And he was actually following--now, you said that he
told you that he was following you earlier; right?
A.  Yes, sir.
Q.  And this conversation occurred last week?
A.  Yes.
Q.  While you were agreeing to testify for the Commonwealth;
right?
A.  Yes.

and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law . . . ."). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1984)). I will not inquire further into the correctness of the state court's determination that Williams had repudiated the plea agreement under Massachusetts law by refusing to plead guilty on May 19, 2006.

Second, Young contends that "[e]ven assuming *arguendo* that the Agreement was no longer in place at the time the statements were given, the agency relationship between the Commonwealth and Williams had not been abolished." Young notes that the Agreement included a provision that Williams would provide to the prosecutor and police any additional information that he learned regarding the shootings. Young argues that given that Williams was dissatisfied with the plea agreement, he had a strong incentive to discover additional inculpatory information, and it should have been predictable to the Commonwealth that Williams would do so. This argument is not compelling.

Although the plea agreement included a provision that Williams was obligated to provide any additional information that he discovered about the crimes, the Appeals Court held that Williams had repudiated that agreement on May 19, 2006, two days before Young made the contested statements. The contents of the

plea agreement are consequently irrelevant. Williams had
indicated that he was not taking the benefits provided and would
not abide by the obligations imposed by the agreement--including
the obligation of the ongoing provision of information.

Furthermore, it was not unreasonable for the Appeals Court
to find that the Commonwealth had not intentionally created a
situation likely to induce incriminating statements pursuant to
*Henry*. Young contends, in essence, that the Commonwealth might
have guessed or hoped that Williams would discover and share
additional inculpatory statements. This speculation is
insufficient ground for habeas relief. Young has not and cannot
point to a Supreme Court case in which the *Massiah* test has been
extended to preclude the introduction into evidence of statements
made to an individual who was not then acting pursuant to an
agreement with the government but who the government merely hoped
might provide information. It was not unreasonable for the
Appeals Court to treat the *Massiah* rule as limited to situations
in which the informant is acting pursuant to a live agreement to
provide information to the government.

Young argues that *United States v. Geittmann*, 733 F.2d 1419
(10th Cir. 1984), supports his position. In *Geittman*, the
government contended that *Henry* did not apply because prior to
the utterance of the incriminating statements at issue the
government had told the informant to stop taping his

conversations with the defendant. *Geittmann*, 733 F.2d at 1427.

The Tenth Circuit rejected this argument, stating:

> [T]he taping of the conversations is not critical here. The
> violation arises from the presentation of defendant's
> inculpatory statements at trial, whether by tape or by
> testimony. Absent a showing that the government instructed
> [the informant] to cease eliciting statements from [the
> defendant], taped or not, our assumption must be that [the
> informant] continued to act as an agent of the government.

*Id.* Young argues that here, similarly, there was no showing that

the government instructed Williams to cease communications with

Young, and in fact the prosecutor did not refuse to consider the

substance of those communications or refuse to allow Williams to

testify when Williams changed his mind a second time.

Young's argument fails for two reasons. First, *Geittmann*

does not constitute "clearly established law" for the purposes of

AEDPA because it was not a Supreme Court decision. *See Williams*,

529 U.S. at 412 (defining "clearly established law" to include

only the holdings of the Supreme Court). Second, Young misreads

*Geittmann*. *Geittmann* does not state that the only way to

terminate an agency relationship between the government and an

informant is for the government to instruct the informant to

cease eliciting statements from the defendant. *Geittmann* states

that merely instructing an informant to cease *taping*

conversations does not terminate the agency relationship between

the informant and the government. *Geittmann* does not address or

in any way consider how an informant might terminate that
relationship as Williams did here.

For these reasons, it was not unreasonable for the Appeals
Court to reject Young's *Massiah* claim because Williams was not an
agent of the Commonwealth at the time that the incriminating
statements were uttered.

## 2.   Intention

The second reason the Appeals Court concluded that the
government did not violate Young's Sixth Amendment right to
counsel was that the government did not intentionally place
Williams and Young together on June 21, 2006.  The Appeals Court
stated:

> [E]ven if we assume that Williams was an agent of the
> Commonwealth at the time the defendant made the statements,
> there was no evidence that the Commonwealth intentionally
> had Williams placed in the holding cell with the defendant.

*Young*, 988 N.E.2d at 843.  Young contends that regardless of
whether the Commonwealth deliberately caused Young and Williams
to be placed in the same cell, it nonetheless "intentionally
created the situation which would make it likely that Williams
would take affirmative steps to secure incriminating information
from petitioner."  He argues that the "intent" required is the
intent to act in a way that is objectively likely to allow the
elicitation of information, not the subjective intent to elicit
information from the defendant when taking that action.

28

The First Circuit has rejected the argument that *Henry*
establishes such an objective standard when read in the context
of a petition for habeas relief.  As the First Circuit has framed
the issue:

> [O]ne phrase in *United States v. Henry* could be read to
> invoke an objective standard, the Court saying tersely that
> police may cause a violation of Sixth Amendment rights by
> "intentionally creating a situation likely to induce [a
> defendant] to make incriminating statements without the
> assistance of counsel."  Although one circuit court has
> endorsed an objective standard, this single sentence in
> *Henry* is far from clear: it could be taken to mean that the
> police, having deliberately created a situation, could be
> inferred to have intended the obvious consequences.
> In fact, *Henry*, like *Maine v. Moulton*, involved the
> deliberate use of informants to elicit information from a
> defendant represented by counsel.  Thus, like the other
> Supreme Court cases, *Henry* and *Moulton* involved deliberate
> elicitation.  At best, the Supreme Court's standard remains
> somewhat unclear, so the [state court's] reading is neither
> in direct conflict with nor an unreasonable application of
> Supreme Court precedent.

*Torres v. Dennehy*, 615 F.3d 1, 6 (1st Cir. 2010).  Consistently
with this observation by the First Circuit, I hold that the
subjective standard applied by the state court here was neither
in direct conflict with nor an unreasonable application of
Supreme Court precedent.

Young argues that the First Circuit only acknowledged that
the "one sentence, taken alone, may not explicitly denote an
objective standard," and that "a full reading of the *Henry*
opinion compels the conclusion that the standard promulgated by
*Henry* is an objective one."  I disagree.  The First Circuit
considered *Henry* as a whole, noting that it "involved the

deliberate use of informants to elicit information from a
defendant represented by counsel," *Torres*, 615 F.3d at 6, and
consequently did not utilize an objective standard.  Moreover,
Young does not and cannot point to any other part of the *Henry*
opinion that indicates that an objective standard should be
imposed and does not and cannot explain why a "full reading" of
the decision compels such a conclusion.

Young argues that *Henry*'s imposition of an objective
standard is made clear "by the fact that the express basis of
Justice Blackmun's dissent in that case, in which Justice White
joined, is that the Court, with its 'new objective approach,'
cuts loose from the moorings of *Massiah* because that case 'covers
only actions undertaken with the specific intent to invoke an
inculpatory disclosure.'"  However, I do not look to the dissent
to characterize the majority opinion, but instead to the text of
the majority opinion itself.  This is especially so in the
context of a petition for habeas relief, where the relevant body
of law to which the state court decision is to be compared is
"the holdings, as opposed to the dicta, of [the Supreme] Court's
decisions as of the time of the relevant state-court decision."
*Williams*, 529 U.S. at 412.  Justice Blackmun's dissent is simply
not determinative in the habeas context.

For these reasons, it was not unreasonable of the Appeals
Court to reject Young's *Massiah* claim because the Commonwealth

did not place Williams and Young together with the intention of enabling the elicitation of incriminating information.

### 3.  Volunteered Statements

The third reason offered by the Appeals Court in concluding that the government did not violate Young's Sixth Amendment right to counsel was that Williams did not interrogate Young and instead Young volunteered the incriminating statements.  The Appeals Court observed that:

> [T]he statements of the defendant indicate that they were not the product of any questioning or interrogation by Williams.  Rather, the statements were volunteered by the defendant in order to make a deal, i.e., if Williams agreed not to testify against the defendant in his trial, the defendant would help Williams in his trial.  Volunteered statements do not implicate the Sixth Amendment.

*Young*, 988 N.E.2d at 843.  Young contends that the Appeals Court applied the wrong standard because "the deliberate elicitation standard as set forth by *Henry* encompasses other more subtle forms of stimulating incriminating admissions than overt questioning."

In *Henry*, "according to his own testimony, [the informant] was not a passive listener; rather, he had 'some conversations with [the defendant]' while he was in jail and [the defendant's] incriminatory statements were 'the product of this conversation.'" *Henry*, 447 U.S. at 271.  "Although the informant had not questioned the defendant, the informant had 'stimulated' conversations with the defendant in order to 'elicit'

31

incriminating information.  The [*Henry*] Court emphasized that those facts, like the facts of *Massiah*, amounted to 'indirect and surreptitious interrogatio[n]' of the defendant."  *Kuhlmann v. Wilson*, 477 U.S. 436, 458 (1986) (second alteration in original). Similarly, in *Maine v. Moulton*, 474 U.S. 159 (1985), where the informant "repeatedly asked the defendant to remind him of the details of the crime, and encouraged the defendant to describe his plan for killing witnesses," the Supreme Court found that "the informant's participation in this conversation was the functional equivalent of interrogation."  *Kuhlmann*, 477 U.S. at 458-58 (internal quotation marks omitted).  By contrast, in *Kuhlmann v. Wilson*, where the informant "at no time asked any questions," and only remarked "that respondent's initial version of his participation in the crimes 'didn't sound too good,'" *id.* at 460, the Supreme Court found no Sixth Amendment violation, holding that to make out a violation of the right to counsel a "defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks," *id.* at 459.

     To the extent that the Appeals Court may be understood to have held that simply because Williams did not ask any questions, there was consequently no Sixth Amendment violation, such a holding would be a questionable application of *Henry* and *Kuhlmann*.  However, it is not clear that the Appeals Court so

held.  The Appeals Court found that the incriminating statements were not the result of questions or interrogation but instead were *volunteered*.  The Appeals Court appears to have concluded that Young volunteered the incriminating statements and that the statements were not solicited by Williams in any way.  In the habeas context, I will read the Appeals Court's decision to rely on this basis to deny relief.  *Cf*. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must still be met by showing there was *no* reasonable basis for the state court to deny relief.") (emphasis supplied).

For his part, Young contends that it would be unreasonable to find that Williams merely listened to Young for several reasons.

First, Young argues that "[i]t would be too coincidental that Petitioner just happened to bare his soul to Williams in the nick of time so that Williams could testify against him."  I do not find the discussion to be "too coincidental."  It was hardly unreasonable to find that, facing imminent trial, Young would suggest a deal that would prevent Williams from testifying.

Second, Young argues that "it's absurd to think that Petitioner prattled on about cutting mutual deals, silencing witnesses, threatening Williams and even confessing why he shot Williams, without engagement by Williams."  Young does not point

to anything in the record indicating that Williams stimulated the conversation.  Although it is unlikely that Williams remained silent, the *Kuhlmann* Court allowed some minimal engagement by the informant without holding that such engagement constituted the deliberate elicitation of incriminating remarks.  The Appeals Court was not unreasonable in finding that Young volunteered his incriminating statements (and that Williams did not stimulate the conversation or otherwise solicit the statements) where there is nothing in the record reflecting Williams's participation in the conversation.

Finally, Young argues that "by the time that Williams and Petitioner had their conversation in the tank, Williams had persuaded him that, far from using Petitioner's words against him, Williams was on his side."  In response to letters from Young, Williams had written two letters to Young "because he didn't want any trouble and he wanted [Young] to think that he wasn't going to testify" and because he "didn't want to be called a snitch."  Williams testified: "[Young] wrote me and I wrote him back just to get him off my back to make it seem that everything's all right."  He testified that he had written in order to ask Young to stop telling others that Williams had testified against Young before a grand jury.  Young contends that through these letters, Williams "lured the defendant into his

confidence"; Young argues that the letters constituted solicitation of the incriminating statements.

The Supreme Court has not articulated precisely when communications constitute stimulation of conversation about a crime or solicitation of incriminating statements. It has held that the informant must have taken "some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks," *Kuhlmann*, 477 U.S. at 459, but it has not stated what level of "action" is required. In this case, the letters sent by Williams contained no questions and solicited (and received) no responses. There is no indication that Williams sent the letters shortly before the conversation; one is undated, while the second is dated 2005. There is no evidence that Williams and Young communicated in the intervening period before they met in the holding cell. Consequently, it was not unreasonable to find that the letters and the communications in the holding cell were not a part of one ongoing conversation. While the letters might have generally encouraged trust between the parties, it was not unreasonable to find that they did not "stimulate conversation" about the crimes or otherwise elicit the incriminating remarks. Further, it was not unreasonable to find that the letters were not "designed deliberately to elicit incriminating remarks," *id.*, where Williams testified that the purpose of the letters was to ask Young to stop telling others that Williams had testified

against him (after other inmates heard and attempted to assault Williams) and where there is no evidence on the record that Williams had any other purpose in sending the letters.

### 4. Conclusion Regarding Massiah Rights

The Appeals Court provided three supportable bases for finding the *Massiah* rule inapplicable. Young has not refuted the reasonableness of those bases and consequently has not demonstrated that habeas relief is warranted because of the government's violation of his Sixth Amendment right to counsel.

## III. CONCLUSION

For the reasons stated herein, I GRANT Respondent's motion to dismiss the petition for writ of *habeas corpus*.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE